IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

LUCINDA CASHION,

     Plaintiff,

v.                                  No. 13-1226

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

     Defendant.

_____

## OPINION

_____

### INTRODUCTION AND PROCEDURAL BACKGROUND

This action was brought pursuant to 42 U.S.C. § 1383(c) by the Plaintiff, Lucinda Cashion, seeking judicial review of the final decision of Carolyn W. Colvin, Commissioner of Social Security, denying her claim for Supplemental Security Income. She applied for benefits on June 18, 2010, alleging disability beginning June 1, 1999. Her application was denied initially and on reconsideration. A request for hearing was filed on January 19, 2011. Following a hearing on January 17, 2012, Administrative Law Judge (ALJ) Audrey M. Scott denied Cashion's claim. Her request for review by the Appeals Council was denied and this action followed.

### STANDARD OF REVIEW

It is the task of the Commissioner to determine whether a claimant is entitled to benefits under the Social Security Act. *Sorrell v. Comm'r of Soc. Sec.,* ___ F. App'x ___, 2016 WL

_____

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

4245467, at *4 (6th Cir. Aug. 11, 2016). A federal court's review of the Social Security Administration's denial of a claim for benefits "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence requires more than a mere scintilla but less than a preponderance; substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (internal quotation marks omitted). This standard has been described as a "modest" one. *Taskila v. Comm'r of Soc. Sec.,* 819 F.3d 902, 904 (6th Cir. 2016). "Yet, even if supported by substantial evidence, a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)) (alteration in original).

To establish eligibility for disability benefits, an applicant must show an inability to engage in any substantial gainful activity resulting from a long-lasting impairment. 42 U.S.C. § 1382c(a)(3)(A); *Taskila,* 819 F.3d at 903.

> The Social Security Administration processes applications for relief by asking five questions: (1) Does the claimant show she is not engaged in substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet any one of the items on a list of impairments presumed severe enough to render one disabled? (4) Can the claimant perform her past jobs? (5) Can the claimant perform other jobs that exist in significant numbers in the national economy?

*Taskila*, 819 F.3d at 903 (internal quotation marks omitted). "The claimant bears the burden of proof through the first four steps of the inquiry, at which point the burden shifts to the

Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity [("RFC")]." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016).

*RELEVANT RECORD EVIDENCE*[2]

On the date of the hearing before the ALJ, the claimant was forty-three years old. She attended special education classes until she left school after the eighth grade. She attempted, but did not obtain, a general education diploma. (D.E. 9-3 at PageID 74.) Cashion held brief jobs as a factory worker, convenience store clerk and retail store stocker and, in the early 1990s, was fired from a convenience store job after three months when she had a panic attack at work. (D.E. 9-16 at PageID 541, D.E. 9-8 at PageID 178.) It was the longest employment position she ever held. (D.E. 9-16 at PageID 541.)

In February 2008, she visited Pathways of Tennessee, Inc. ("Pathways") for depression and a feeling that she was "loosing [sic] her mind." (D.E. 9-12 at PageID 334.) She informed personnel at the facility that she had experienced deaths in her family, had suffered mental abuse from her ex-husband and ongoing sexual abuse by an uncle, had been depressed for about two years, and heard voices, some of which told her to harm herself. (*Id.* at PageID 334-35, 348, 356, 365; D.E. 9-14 at PageID 454.) She also advised that she began drinking alcohol and smoking crack cocaine once per week at the ages of eighteen and thirty-six, respectively, but had used neither substance in the preceding year. (D.E. 9-12 at PageID 339.) A Global Assessment of Functioning (GAF) score of forty-seven was assigned.[3]

---

[2]Although there is evidence in the record concerning medical issues, the Plaintiff's appeal to this Court focuses solely on her mental impairments. Thus, the Court will do so also.

[3]"A GAF score is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Shine v. Comm'r of Soc. Sec.*, Case 3:15CV1162, 2016 WL 4729303, at *2 n.2 (N.D. Ohio Sept. 12, 2016). A score of forty-one to

On February 20, 2008, during a home visit by her case manager, Cashion reported that her uncle had again assaulted her. (D.E. 9-13 at PageID 404.) Lack of progress was indicated. (*Id.*) The following week, she reported that she was feeling better about her father's death and the sexual abuse. (*Id.* at PageID 402.) She was anxious at times but generally making some progress, although she stated she was having some side effects from her medications. (*Id.* at PageID 402-04.)

Over the course of her treatment and monitoring at Pathways, her appearance was usually described as "neat" and her hygiene "appropriate." (D.E. 9-12 at PageID 345, 348, 351, 353-54, 356-57, 359-63, 365-67, 369-73, 375-77; D.E. 9-13 at PageID 383-86, 389, 392, 394-99, 402-04.) On March 7, 2008, Plaintiff reported that her psychiatric medications were not working and that she was having problems with sleep and anxiety. (D.E. 9-12 at PageID 353.) She advised on March 13, 2008, that her medication issues had been resolved, things were "going well" and she was feeling better. (D.E. 9-13 at PageID 397.) During an interview on March 20, 2008, the claimant described continued nightmares involving her uncle and sleep problems, but decreasing feelings of guilt and depression. (*Id.* at PageID 396.) Her case manager determined she was making progress. (*Id.*) Cashion related on March 27, 2008, she was again having nightmares about rape and physical abuse by her uncle. (*Id.* at PageID 395.) She reported feeling less fearful, however, since she had informed her family of the abuse. (*Id.*) The claimant added that, subsequent to beginning to work on her issues, she was "feeling some better about herself." (*Id.*) The next day, Plaintiff reported that her sleep medication was not working well, causing her to lie awake for hours, and that she suffered an anxiety attack without warning. (*Id.* at PageID

fifty indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* (citing Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000).

394.)  However, she stated that, overall, she was "doing good."  (*Id.*)  The case manager reported fair or no progress at that time.  (*Id.*)

In early April 2008, she was having nightmares about her father's death, which had occurred one year earlier.  (*Id.* at PageID 392.)  On April 14, 2008, the claimant advised that her medications appeared to be "working well" and that she was suffering no more stress than usual.  (*Id.* at PageID 391.)  Although she was dressed in pajamas, she had appropriate hygiene.  (*Id.*)  It was noted that she was making no progress.  (*Id.*)  Cashion reported feeling "much better" on April 25, 2008, with decreased depression, anxiety, fear and nightmares.  (*Id.* at PageID 389.)  The case manager recorded "fair" progress at this time.  (*Id.*)  Days later, Plaintiff reported an anxiety attack brought on by her boyfriend's arrest.  (*Id.* at PageID 388.)  She took her medication and "everything turned out ok."  (*Id.*)  The claimant was wearing pajamas for the interview but her hair was tidy and she exhibited good hygiene.  (*Id.*)  Her progress had stalled.  (*Id.*)

On May 8, 2008, Cashion appeared for her Pathways appointment angry, stating that her boyfriend had been jailed and fired from his job, and her uncle had attempted to rape her.  (*Id.* at PageID 385.)  A week later, on May 16, 2008, the claimant reported "doing good" on her psychiatric medication and that her family planned to confront the uncle concerning continuing attempts at sexual assault.  (D.E. 9-12 at PageID 351.)  She was described in progress notes as "bright, smiling [and] talkative," with no signs of severe depression or anxiety.  (*Id.*)  While she wore pajamas to a May 2008 appointment, her hygiene was appropriate.  (D.E. 9-13 at PageID 382.)  On May 22, 2008, Cashion felt stressed and had nightmares and problems with recall.  (*Id.* at PageID 383.)  Her progress at that time was characterized as "fair."  (*Id.* at PageID 383, 385.)

She presented to the Volunteer Community Hospital emergency room in Martin, Tennessee, in June 2008 complaining of chest pain and shortness of breath, but was in no acute distress. (D.E. 9-11 at PageID 293-94.) She was transferred to a larger hospital in Jackson, Tennessee, (*id.* at PageID 298-99) and underwent a left heart catheterization, which was normal (*id.* at PageID 313). During that month, progress notes from Pathways indicated that she had not experienced nightmares, depression, fears or sleep problems. (D.E. 9-12 at PageID 373.) It was also documented that she was "feeling fine," that she was taking her medications as prescribed and that she was making progress. (*Id.* at PageID 375.)

In July 2008, Cashion told the case manager that she was not having problems with depression or low self-esteem/self worth, was using skills for self-improvement, and no longer feared staying at home alone. (*Id.* at PageID 369.) She also noted that things had been going well at home and that her depression and nightmares had decreased. (*Id.* at PageID 369, 371.) On July 10, 2008, Plaintiff advised that she was continuing to feel good about herself and was having good relations with her uncle. (*Id.* at PageID 370.) Appointments in July 2008 reflected progress. (*Id.* at PageID 369-72.)

In notes from August 2008, a nurse practitioner at Pathways recorded that Plaintiff appeared for lab work and had fair hygiene and was polite and cooperative. (*Id.* at Page ID 347.) On August 14, 2008, the claimant stated that she had been hearing voices telling her to overdose on pills for three days. (*Id.* at PageID 365.) She considered it until she realized the voices were not real. (*Id.*) During a home visit on August 20, 2008, during which the Plaintiff wore pajamas, her case manager noted continuing auditory hallucinations and no progress with treatment. (*Id.* at PageID 364.) Cashion advised Pathways personnel on August 28, 2008, that she was again

having nightmares about her abuse but that her life stressors had not increased. (*Id.* at PageID 363.)

In early September 2008, the Plaintiff told her case manager that, since she stopped taking one of her medications, she had experienced no more voices, nightmares or nervousness. (*Id.* at PageID 360, 362.) She was also leaving the house to go out with family members. (*Id.* at PageID 361.) Later in the month, however, she advised that she was experiencing situational stress over financial issues and had been under a lot of stress for a number of months. (*Id.* at PageID 359.) She continued to hear voices telling her to kill herself. (*Id.*)

On October 8, 2008, she related during a home visit that she was looking forward to dressing up for Halloween and handing out candy to the children. (*Id.* at PageID 357.) The following day, she stated that she was blocking out the voices in her head to the point she hardly noticed them. (D.E. at PageID 356.) Notes from October 16, 2008, reflected jitteriness and slurred speech with more voices telling her she would be better off committing suicide. (*Id.* at PageID 345.) She denied having any plan or intent to do so, however. (*Id.*) No overt signs of psychosis were observed. (*Id.*) The claimant also had poor sleep quality and hallucinations. (*Id.*) A GAF score of forty-five was assigned.

Cashion advised Pathways personnel in May 2009 that she was sleeping poorly and heard voices commanding her to self-harm on and off every two months. (D.E. 9-14 at PageID 454.) Progress notes indicated that she had not been seen in six months and could not have been medication compliant. (*Id.* at PageID 455.) In June, Plaintiff related she was doing well on her medications. (*Id.* at PageID 453.) She indicated on August 2009 that she was experiencing sleep difficulties, nervousness and anger. (*Id.* at PageID 451.) On August 17, 2009, an Abnormal

Involuntary Movement Scale Examination Procedure was performed with no positive results. (*Id.* at PageID 452.)

In notes dated February 1, 2010, the case manager wrote that she had not been seen since October 2009. (*Id.* at PageID 445.) Some continued desire to isolate was reported due to increased anxiety around other people. (*Id.*) No overt signs of severe depression or anxiety were observed. (*Id.*) Approximately six weeks later, Plaintiff advised Pathways she was "doing good" on her medications but reported periods of depression and anxiety. (*Id.* at PageID 443.) Notes from March 22, 2010, revealed that Cashion was "doing ok" and that her mother had been away. (D.E. 9-15 at PageID 482.) During this time, she babysat two small children, took care of the house and prepared meals. (*Id.*) On March 11, 2010, the claimant appeared for her interview clad in pajamas, but reported things were "going ok" and that she was taking her medications. (*Id.* at PageID 483.)

She related on April 19, 2010, that she was "doing good" but had some depression, anxiety, and was "biting everybody's head off." (D.E. 9-14 at PageID 443.) She also indicated that she had not experienced nightmares in a while and passed the time playing computer games. (*Id.* at PageID 475.) That same day, another Abnormal Involuntary Movement Scale Examination Procedure was conducted at Pathways, again without positive results. (*Id.* at PageID 444.)

In June 2010, the claimant's case manager noted that she was still in her pajamas in the afternoon. (D.E. 9-14 at PageID 459.) When a Pathways employee delivered prescriptions to Plaintiff on one occasion during this period, he mother had to get her out of bed. (*Id.* at PageID 463.) In the spring and summer of 2010, she generally exhibited minimal participation and no progress, even though she was medication compliant. (*Id.* at PageID 459, 464-65, 468, 478.)

Sleep difficulties were also reported. (*Id.* at PageID 464.) Cashion did some babysitting and attended a cookout and a family reunion. (*Id.* at PageID 460-61, 468.)

In a function report completed on July 30, 2010, Plaintiff advised she suffered from flashbacks that caused her to "shut down." (D.E. 9-8 at PageID 195.) It would take two to three days for her to get "back to [her] normal self." (*Id.*) She feared being around others, feared being alone, and awoke in the middle of the night from fear. (*Id.* at PageID 195-96.) She described a normal day as going to the bathroom, drinking coffee, using the computer, washing dishes after dinner and sometimes washing clothes. (*Id.*) She enjoyed computers, television, radio and "deep thought." (*Id.* at PageID 199.) Claimant bathed herself once every three days, did not get dressed, and often lost track of what she was doing. (*Id.* at PageID 196, 198.) Her mother did the cooking and encouraged her to perform household tasks, although it took her a long time to complete them. (*Id.* at PageID 197.) She avoided going outdoors. (*Id.* at PageID 198.) Cashion reported that she did not go out unless a family member accompanied her and that she had no driver's license because "they said [she] was too nervous." (*Id.*) She could pay bills, make change and handle a savings account but did not feel comfortable balancing a checkbook. (*Id.*) The claimant also related that she "freezes up" when she is around groups of people. (*Id.* at PageID 200.) In her opinion, she had trouble with memory, completing tasks, concentration, understanding, following instructions and dealing with others. (*Id.*) Cashion did not get along with authority figures, particularly if they were male. (*Id.* at PageID 201.)

The Plaintiff underwent a psychological evaluation at West Tennessee Psychological Group on September 2, 2010. (D.E. 9-16 at PageID 539-44.) In his report, co-signed by clinical psychologist Dennis W. Wilson, Ph.D., consultative psychologist Gary Smithson, M.A., S.L.P.E., noted that she was appropriately dressed and that her hygiene and grooming were

"fair."  (*Id.* at PageID 539.)  He described her mental history and activities of daily living as follows:

> Ms. Cashion describes experiencing depression since childhood.  She feels her depression is related to having been raped and sexually abused as a child.  She also states that she suffers from [post-traumatic stress disorder ("PTSD")] and panic attacks.  In describing symptomology, she stated, "I have flashbacks about the rape and abuse.  I have nightmares about this.  I'm anxious around people, especially men.  I'm sad most of the time.  I feel worthless and hopeless.  I stay to myself."  She states she has experienced panic attacks since childhood.  She states she currently has panic attacks two or three times a week.  When asked if she is aware of anything in particular that triggers her panic attacks, she stated, "certain things I hear on TV programs, flashbacks."  She also reports difficulty being in the public due to panic attacks.  She states she is unable to go in stores by herself due to anxiety and panic attacks.  In describing symptomology of panic attacks, she stated, "I have trouble breathing.  I get real nervous.  My stomach gets upset.  It throws me into an asthma attack."  She describes experiencing difficulty falling asleep, intermittent awakening and early morning insomnia every night for "over twenty years."  She denies experiencing appetite difficulties.  She reported no recent weight gains or losses.  She describes experiencing unprovoked crying spells once a week for the past month.  She states she sometimes experiences suicidal ideation, but denies any specific plan or intent to harm herself.  She reports no history of suicide attempts.  She denies experiencing homicidal ideation.  Family history is said to be positive for depression in her brother.  She denies any family history of suicide.  She states she has been participating in outpatient mental health treatment at Pathways for the past two years.  She goes for medication evaluations once eery [sic] three months.  She states that she sees a counselor on an "as needed basis," and that she has a case manager who visits her at her home twice a month.  She reports no history of inpatient psychiatric treatment.
>
> *            *            *
>
> . . .  She is able to bathe and dress herself.  She states that she doesn't need reminders to care for her personal hygiene.  She does state that she needs reminders to take her medications and to keep appointments.  When asked how she typically spends the day, she stated, "watch TV, play on the computer."  She watches television eight or nine hours a day.  She denies spending any time reading, adding, "I can't read very well."  She states that her hobby is playing games on the computer.  She states that she has a boyfriend whom she socializes with.  She states that she doesn't have any other friends.  She states that she doesn't do any yard work, adding, "I'm not motivated."  She and her mother both do the laundry once a week, for one or two hours at a time.  She states that her mother does the housekeeping, grocery shopping, and cooking.  She does not have an automobile, or a driver's license, and doesn't drive.  She states she has

never tried to obtain a driver's license. She states that she is able to follow oral and written instructions. She states that she is able to count change, handle a checkbook, and make financial decisions. She indicates that she requires some prompting when performing activities. She states she is able to behave in an acceptable manner when engaged in activity. She indicates that she is able to perform the activities that she does in an adequately effective and consistent manner.

When asked what a particularly bad day might be like, Ms. Cashion replied, "I don't even get out of bed. I have flashbacks. I won't leave home. I stay to myself." She states she has bad days two or three days a week. When asked if there are any activities she used to be able to do that she can no longer do because of her mental condition (to assess premorbid activities of daily living), she replied, "I used to be able to go grocery shopping and walking."

(*Id.* at PageID 540-41.)

He assigned a GAF score of fifty and opined that Cashion's ability to understand and remember locations, work procedures and instructions was moderately to markedly limited due to "impairment of short-term memory and lowered concentration, thought to be associated with depression, anxiety and likely somewhat lowered intellectual functioning"; ability to sustain concentration and persistence was markedly limited because of short-term memory, lowered concentration, anxiety and panic attacks; social interaction was markedly limited resulting from anxiety, panic attacks and social isolation; and adaptation, including the "ability to respond appropriately to changes in the work setting; be aware of normal hazards and take precautions; travel unaccompanied to unfamiliar places or use public transportation; [and] set realistic goals/make plans independently of others," was moderately limited because of limited coping skills, lowered concentration and anxiety. (*Id.* at PageID 543-44.)

In the report's summary section, Smithson stated as follows:

Ms. Cashion presented in a credible manner, and overall findings appear to be consistent and reliable. She describes experiencing depression, PTSD and panic attacks since childhood. She reports a history of childhood sexual abuse and rape. She reports experiencing nightmares and flashbacks associated with the abuse. She reports difficulty being in the public due to panic attacks. She describes

isolating herself others [sic]. She reports a history of abuse of marijuana and cocaine, in full remission. There were no indications of psychotic process, hallucinations or delusions. Short-term memory appears to be impaired. Long-term memory appears to be adequate. Behaviorally, she appears to be functioning intellectually within the Borderline range. She reports a history of special education. She states that she quit school in the 8th grade, at 17 years of age. Mood appeared to be moderately dysphoric. Behavioral observations suggested moderate levels of anxiety. Overall findings suggest that Ms. Cashion meets DSM-IV-TR diagnostic criteria for Major Depressive Disorder, Recurrent, Moderate; [PTSD]; Panic Disorder with Agoraphobia[4]; Cannabis Abuse (in full remission); Cocaine Abuse (in full remission); R/O Borderline Intellectual Functioning; and R/O Personality Disorder, NOS. Due to her long-standing history of emotional difficulties, prognosis for improvement over the next year or so appears to be guarded.

(*Id.*)[5]

Nonexamining consultant psychologist Mason D. Currey, Ph.D., completed a Mental RFC Assessment in September 2010. (*Id.* at PageID 562-64.) He opined that she suffered from PTSD, panic disorder with agoraphobia, and personality disorder NOS, provisional. (*Id.* at PageID 553, 555.) Dr. Currey rated her functional limitations with respect to restrictions of activities of daily living; difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace as moderate. (*Id.* at PageID 558.) He found no episodes of decompensation. (*Id.*) He concluded that her abilities to recall locations and work procedures and to understand and remember very short and simple instructions were not significantly limited and her capability for understanding and remembering detailed instructions was moderately limited. (*Id.* at PageID 562.) He further determined that she was not significantly limited in carrying out very short and simple instructions; performing activities within a schedule, maintaining regular attendance and being punctual within customary

---

[4]The Mayo Clinic has defined agoraphobia as "a type of anxiety disorder in which [one] fear[s] and often avoid[s] places or situations that might cause [one] to panic and make [one] feel trapped, helpless or embarrassed." www.mayoclinic.org/diseases-conditions/agoraphobia/basics/definition/con-20029996 (last visited Sept. 21, 2016).

[5]The ALJ did not make any findings relative to her past drug use.

tolerances; sustaining an ordinary routine without special supervision and making simple work-related decisions. (*Id.*) The consultant rated her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination and proximity to others without distraction, complete a normal workday without interruption from symptoms and to perform at a consistent pace without unreasonable rest periods as moderately limited. (*Id.* at PageID 562-63.) It was Dr. Currey's opinion that she was markedly limited in interacting appropriately with the general public; moderately limited in accepting instructions and responding appropriately to criticism from supervisors and getting along with co-workers without distracting them or exhibiting behavioral extremes; and not significantly limited in asking simple questions or requesting assistance, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness. (*Id.* at PageID 563.) Finally, with respect to adaptation, the claimant was found to be not significantly limited in being aware of normal hazards, taking appropriate precautions and traveling in unfamiliar places or using public transportation; and moderately limited in responding appropriately to changes in the work setting and setting realistic goals or making plans independently of others. (*Id.*) His functional capacity assessment was as follows:

A.      Claimant has the ability to understand and remember simple instructions.

B.      Claimant has the ability to maintain attention and concentration for periods of at least 2 hours, with the above restrictions.

C.      Claimant cannot interact appropriately w[ith] general public and has the ability to relate appropriately to peers and supervisors, with the above restrictions.

D.      The [claimant] can adapt to infrequent change and set limited goals, with the above restrictions.

(*Id.* at PageID 564.)

In a disability report completed sometime after June 24, 2010, Plaintiff listed her medications as Citalopram (Celexa) for depression, Buspar for anxiety, Invega for psychosis and Trazodone for sleep, all prescribed by Pathways. (D.E. 9-8 at PageID 223.) No dosages were noted and the claimant advised she suffered no side effects. (*Id.*) In a "remarks" section, Cashion described episodes during which she "clam[med] up," got "real nervous" and had "spells" that lasted approximately four hours. (*Id.* at PageID 225.) The occurrences, which made her feel "unlike" herself, caused her to be "jittery" and unable to function. (*Id.*) She did not want to go out in public because she did not know when an episode would take place. (*Id.*) Triggers included men, strangers, getting flustered and pressure changes. (*Id.*)

On or about September 7, 2010, the Plaintiff was evaluated by consultative examiner Robert Sanner, M.D., for the purpose of providing height, weight and blood pressure, and to assess heart rate and breathing sounds. (D.E. 9-16 at PageID 546.) He found her alert, oriented times three, cooperative, reliable and in no apparent distress. (*Id.*) The physician noted PTSD by history and agoraphobia, which might contribute to breathing problems; probable paroxysmal atrial tachycardia; migraines and asthma by history. (*Id.* at PageID 547.) Station, gait and mobility were normal. (*Id.* at PageID 546.) Because of the brevity and narrow scope of the evaluation, Dr. Sanner reported that he was "unable to make a determination about [Cashion's] ability to perform the stated medical assessment tasks." (*Id.* at PageID 547.) At about this time, Cashion was reporting sleep difficulties and rising anxiety to her Pathways case manager. (D.E. 9-17 at PageID 587-88.) Lack of progress and resistance were noted in her treatment records. (*Id.* at PageID 589-90.)

In an Assessment of Daily Functioning dated October 1, 2010, Billie Sue Blythe, Rehabilitation Coordinator at Pathways, related that Cashion had difficulty expressing herself

and did better when others assisted her in voicing concerns. (*Id.* at PageID 584.) Blythe indicated on the form that the claimant was responsive and had made progress through treatment. (*Id.*)

Pathways progress notes from October 11, 2010, reflected neat appearance, appropriate hygiene and good sleep with no overt signs of psychosis, severe depression or anxiety. (*Id.* at PageID 573.) Plaintiff advised she was "just fine." (*Id.*) Notes also showed that she was "resistant" and not venturing outdoors. (*Id.* at PageID 583.) On October 17, 2010, on a self-described "bad day," the claimant related that she was still "just fine" but reported continued sleep problems and depression at the level of seven on a scale of one to ten. (D.E. 9-14 at PageID 448.) She indicated that her "good" days averaged a depression level of three. (*Id.* at PageID 449.) On a lab appointment October 26, 2010, notes mentioned that Cashion appeared disheveled and unwashed. (D.E. 9-17 at PageID 572.) The same day, according to progress notes, Cashion was "appropriately dressed" but not talkative, and reported to her case manager that she was sleeping well, reading more, spending less time on the computer and complying with medications. (*Id.* at PageID 580.) The claimant requested to be taken to the grocery store to pick up a few items. (*Id.*) Three days later, notes from a home visit reflected that she had not filled out "papers for social security," even though they had been explained to her over the phone, and required assistance. (*Id.* at PageID 579.) While she was agreeable, Cashion was twitching nervously during the interview. (*Id.*) She was, however, described as making progress. (*Id.*)

Notes dated November 2, 2010, indicated that the claimant was appropriately dressed and reported "doing ok," being medication compliant, sleeping at night and feeling rested the

following morning, reading and spending time on the computer. (*Id.* at PageID 571.) No progress was observed. (*Id.*)

In a second function report completed on November 18, 2010, Cashion related that she could not concentrate long enough to complete a job; could not cook because she would forget about food on the stove; had bad dreams; had to be reminded to bathe, wash her hair and take her medication; forgot to complete household chores after being reminded to do them; went outside rarely because it brought back bad memories; and did not drive because she was too nervous. (D.E. 9-8 at PageID 212-15.) She did advise that she could use a checkbook and get along with authority figures "pretty good." (*Id.* at PageID 215, 218.) The claimant spent her time reading and watching television, but lost concentration while doing so. (*Id.* at PageID 216.) The Plaintiff related that she could pay attention for only about thirty minutes. (*Id.* at PageID 217.)

The function report was accompanied by two letters. One was from the claimant's brother, William Cashion, in which he related that she suffered a panic attack at a family picnic. (*Id.* at PageID 220.) The other was authored by an individual named William Brackett, who stated that she had difficulty being around others and going outdoors, could not work in public areas, and often retreated to her room during family gatherings. (*Id.* at PageID 221.) A Report of Contact was completed by nonexamining psychologist Robert L. Paul, Ph.D., on November 29, 2010, affirming Dr. Currey's assessment. (D.E. 9-17 at PageID 596.)

Blythe completed a medical (physical) assessment of ability to do work-related activities on January 13, 2011, opining that Cashion could not lift and/or carry objects as tardive dyskinesia caused her to shake and drop light objects; could stand and/or walk for thirty minutes without interruption due to psychotic symptoms; and could sit for two hours at a time because of major depression. (*Id.* at PageID 600-01.) She further stated that the claimant could

occasionally perform postural activities including climbing, kneeling, crouching, stooping, balancing and crawling due to a lack of motivation arising from general anxiety disorder. (*Id.* at PageID 601.) Blythe found her physical functioning, including reaching, feeling, seeing, hearing, handling, pushing, pulling and speaking, was also impaired as a result of lack of motivation, racing thoughts and inability to complete tasks or understand what was expected. (*Id.*) The medical findings supporting that assessment were identified as major depression with psychotic features and general anxiety disorder. (*Id.*) Environmental elements, including height, fumes, noise, humidity, dust, moving machinery, temperature extremes, chemicals and vibration, also affected Plaintiff's ability to work, according to Blythe, because her psychotic features caused her to not react well to change of any kind. (*Id.* at PageID 602.) She added that Cashion was slow to understand, did not ask questions, and always said things were fine. (*Id.*)

In a Tennessee Clinically Related Group Form for Adults dated a year later, on January 13, 2012, Blythe proffered the opinion that the claimant suffered from severe and persistent mental illness. (*Id.* at PageID 604-06.) She stated that Cashion maintained a false belief that she was dealing adequately with her activities of daily living and that she had the ability to function when, according to her family and her case manager, she actually just sat and did nothing. (*Id.* at PageID 605.) She also noted that the claimant remained in her pajamas, failed to get dressed, and did not express herself "well enough to maintain case management services." (*Id.* at PageID 604.) It was Blythe's opinion that Plaintiff's impairments in the areas of activities of daily living; interpersonal functioning; concentration, task performance and pace; and adaptation to change were extreme. (*Id.* at PageID 604-05.) She further opined that Cashion suffered from "[s]evere and [p]ersistent [m]ental [i]llness." (*Id.* at PageID 606.) Blythe assigned the claimant a GAF score of forty. (*Id.*)

At the hearing before the ALJ, Cashion testified that she resided with other family members in Dresden, Tennessee.  (D.E. 9-3 at PageID 76.)  She related that she suffered from depression, anxiety disorder and panic attacks, and had difficulty remembering things.  (*Id.*)  She was under the care of a psychiatrist and took medications for anxiety, depression, bipolar disorder and sleep difficulties.  (*Id.* at PageID 74.)  The claimant stated that she felt nervousness, which escalated into panic attacks, when she entered crowded places.  (*Id.*)  In school, Plaintiff had difficulty concentrating and completing work.  (*Id.* at PageID 78.)  At one time, she was employed at a gas station when a number of customers came in at the same time.  (*Id.* at PageID 77.)  She responded by panicking and retreating to a back room, after which she was dismissed and told to go home.  (*Id.*)

The ALJ had the following exchange with vocational expert ("VE") Dr. Steve Zankas:

Q:     Okay.  Let me give you some hypotheticals.  Now, you heard the claimant's testimony and if the testimony is found to be credible would she be able to perform any of her past relevant work?

A:     No, Your Honor.

Q:     Would she be able to perform any other work in the national economy?

A:     No based on her testimony, Your Honor.

                              *       *       *

Q:     Let me give you another hypothetical.  Assume that the claimant or a hypothetical individual of the same age, educational background and work history with this residual functional capacity, she could work at all exertional levels but should avoid concentrated exposure to fumes, dust, odors, gases and poor ventilation.  She has the ability to understand and remember simple instructions.  She has the ability to maintain attention and concentration for periods of at least two hours within the above restrictions.  She cannot interact appropriately with the general public, and she has the ability to relate appropriately to peers and supervisors within the above restriction.  She can adapt to infrequent changes except limited goals within the above restrictions.  Now given that residual functional

> capacity would the claimant be able to perform any of her past relevant work?

Q: No, she would not, Your Honor.

Q: Would she be able to perform other work in the national economy?

A: Yes, she would, Your Honor.

Q: And what other work would she be able to perform?

A: Examples of other positions would include a small products assembler. The Dictionary of Occupational Titles number 706.684-0022. That is light level work and unskilled with a [Specific Vocational Preparation ("SVP")] of 2. Approximately 20,000 people are employed nationally and 1,500 in the State of Tennessee.

Also a Production Assembler. In the Dictionary of Occupational Titles number 706.687-010. It is also light level work and unskilled with an SVP of 2. There approximately [sic] 439,000 employed nationally and approximately 13,000 in the State of Tennessee.

(*Id.* at PageID 81-82.)

### THE ADMINISTRATIVE DECISION

Upon hearing testimony and reviewing the evidence, the ALJ found that, although the Plaintiff had severe impairments of depression, migraines, chronic obstructive pulmonary disease, psychosis, PTSD, general anxiety disorder and panic attacks, she did not have an impairment or combination of impairments that equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at PageID 56.) She opined:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity[6] to perform work at all exertional levels but with the following nonexertional limitations: she should avoid concentrated exposure to fumes, dust, odors, gases, and poor ventilation. However, she has the ability to

---

[6] A claimant's RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling 96-8P, 1996 WL 374184, at *1 (July 2, 1996). It is the most an individual can do despite his or her limitations or restrictions. *Id.*

understand and remember simple instructions; she has the ability to maintain attention and concentration for periods of at least two hours with the above restrictions; she cannot interact appropriately with the general public; however, she has the ability to relate appropriately to peers and supervisors within the above restrictions; the claimant can adapt to infrequent change and set goals within the above restrictions.

\*     \*     \*

The claimant alleges severe limitations due to her mental impairments. The record indicates that she began treatment at Pathways in 2008, with diagnoses of depression and bereavement. The state agency expert found that the claimant retained the ability to understand and remember simple instructions, maintain attention and concentration for at least two hours, interact appropriately with the general public and peers, and supervisors, and retained the ability to adapt to infrequent change and set limited goals[, citing the Mental RFC Assessment completed by Dr. Currey]. The state agency expert based this opinion on the evidence of the claimant's mental health treatment records [from Pathways], as well as the opinion of [Smithson and Dr. Wilson], all of which tended to show that that [sic] the claimant was improved with medication compliance.

(*Id.* at PageID 58, 61.)

The ALJ afforded "little weight" to Blythe's assessment, noting that

First, they were prepared by the claimant's caseworker, who is not an accepted medical treatment provider source. The caseworker is not a physician and does not provide treatment to the claimant for any condition. Finally, the information contained in these documents is not supported by the totality of the record, and is inconsistent with any other treatment record . . .

(*Id.* at PageID 61-62.)

*ASSIGNMENTS OF ERROR AND ANALYSIS*

In this appeal, the Plaintiff avers that the Commissioner's decision was not supported by substantial evidence. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

In determining whether a claimant is disabled due to an impairment, the Commissioner considers the medical opinions contained in the record as well as other relevant evidence provided. 20 C.F.R. § 416.927(b). "The Commissioner has elected to impose certain standards on the treatment of medical source evidence." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)), *reh'g denied* (May 2, 2013). "These standards, set forth in administrative regulations, describe (1) the various types of evidence that the Commissioner will consider[,] (2) who can provide evidence to establish an impairment[,] and (3) how that evidence will be evaluated[.]" *Id.* (internal citations omitted).

Cashion has posited in her briefing papers that Blythe is a treating source to whose opinion the ALJ was required to accord deference. The so-called "treating physician rule"

> requir[es] the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective cannot be obtained from objective medical findings alone. Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Gentry*, 741 F.3d at 723 (internal alterations, citations & quotation marks omitted). "An ALJ must provide 'good reasons' for discounting the opinion of a treating source, " *Cosma v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 3209500, at *1 (6th Cir. June 10, 2016) (per curiam). "The stated reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to

the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted).

A "treating source" is the claimant's physician, psychologist, or other acceptable medical source who provides her with medical treatment or evaluation and with whom she has an ongoing treatment relationship. 20 C.F.R. § 416.902. The Social Security Regulations include under the term "acceptable medical sources" licensed physicians, psychologists, optometrists and podiatrists, as well as qualified speech-language pathologists. 20 C.F.R. § 416.913(a). If the source of the opinion is not a physician, psychologist or other acceptable medical source, she does not enjoy the controlling weight of a treating source. *See Porter v. Comm'r of Soc. Sec.*, 634 F. App'x 585, 586 (6th Cir. 2016) (per curiam) (medical opinion based on the evaluation of a social worker who did not qualify as a treating source was not entitled to controlling weight); *see also* Soc. Sec. Ruling 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006). There is no evidence that Blythe is a licensed physician or psychologist. Nor does Cashion so claim.

However, evidence may be presented by individuals other than treating sources for the limited purpose of showing the severity of claimant's impairments and their effects on her ability to function. 20 C.F.R. § 416.913(d). This type of source encompasses medical personnel such as nurse practitioners, physician's assistants and therapists; educational and social welfare agency workers; and nonmedical persons including caregivers and family members, a category into which Blythe appears to fall. *Id.* With respect to these sources, Social Security Ruling 06-03P has explained as follows:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically

deemed "acceptable medical sources" under our rules, are important and should
be evaluated on key issues such as impairment severity and functional effects,
along with the other evidence in the file.

Soc. Sec. Ruling 06-03P, 2006 WL 2329939, at *3. "The evaluation of an opinion from a

medical source who is not an 'acceptable medical source' depends on the particular facts in each

case." *Id.* at *5.

The ruling provides that the ALJ

generally should explain the weight given to opinions from these "other sources,"
or otherwise ensure that the discussion of the evidence in the determination or
decision allows a claimant or subsequent reviewer to follow the adjudicator's
reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at *6. Pursuant to the ruling, the Sixth Circuit has held that an ALJ should discuss factors

relating to her treatment of the source's assessment, "including how long the source has known

the individual, how consistent the opinion is with other evidence, and how well the source

explains the opinion," so as to provide some basis for its rejection. *Cruse v. Comm'r of Soc.

Sec.*, 502 F.3d 532, 541 (6th Cir. 2007); *see also McNamara v. Comm'r of Soc. Sec.*, 623 F.

App'x 308, 309 (6th Cir. 2015) (per curiam). However, this does not require the ALJ to

articulate "good reasons" for rejecting a nonacceptable medical source's opinion as is mandated

for the discounting of a treating physician's assessment. *Engebrecht v. Comm'r of Soc. Sec.*, 572

F. App'x 392, 399 (6th Cir. 2014).

Plaintiff's alleged mental impairments were considered with respect to the Regulations'

Listings of Impairments at §§ 12.04 and 12.06. Impairments for affective disorders under §

12.04, "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or

depressive syndrome," and for anxiety-related disorders under § 12.06, where anxiety is the

predominant disturbance or is experienced when the individual attempts to master symptoms,

must result in at least two of the following: "[m]arked restriction of activities of daily living";

"[m]arked difficulties in maintaining social functioning"; "[m]arked difficulties in maintaining concentration, persistence, or pace"; or "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpart P, App. 1, §§ 12.04, 12.06. "Marked" for purposes of the listings "means more than moderate but less than extreme." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00. "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, so long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

The ALJ fashioned her hypothetical from the opinion of nonexamining consultant Dr. Currey, who found a marked limitation only in Plaintiff's ability to interact appropriately with the general public. The Regulations require that all medical opinions be evaluated. 20 C.F.R. § 416.927(c). The ALJ is, generally speaking, to give more weight to the opinion of an examining source than to one who has not examined the claimant. 20 C.F.R. § 416.927(c)(1). Because nonexamining sources "have no examining or treating relationship with [the claimant], the weight [given to] their opinions [depends] on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 416.927(c)(3). The ALJ is to take into account "the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 416.927(e)(2)(ii). She "must explain in the decision the weight given to the opinions." *Id.*

Here, the explanation offered by the ALJ for crediting Dr. Currey's opinion[7] at the exclusion of all others with respect to Plaintiff's mental limitations was that it, as well as the Pathways treatment records and the findings of Smithson, an examining consultant, tended to show that Cashion's condition was improved with medication compliance. Even if it were sufficient under the Regulations, this explanation was patently wrong with respect to Smithson's report, which did not so much as mention medication compliance. Indeed, if anything, his finding supported the opposite conclusion, as it indicated Cashion continued to suffer mental difficulties despite her medications. Moreover, a determination from a review of the Pathways records that Plaintiff's condition improved when she took her medications was to ignore large swaths of observations documenting little or no overall progress; failures to dress; continued intermittent sleep difficulties, auditory hallucinations telling her to kill herself, stress, nightmares and forgetfulness; depression; anxiety; resistant behavior; avoidance of the outdoors; nervous twitching and an inability to complete Social Security forms without assistance even at times when she was medication compliant. These observations are supported by the remainder of the record, including functional reports, Plaintiff's testimony and Smithson's evaluation report. "Generally, the more consistent an opinion is with the record as a whole, the more weight [is to be given] to that opinion." 20 C.F.R. § 416.927(c)(4).

Although more limiting, the findings of Blythe were consistent in many respects to those of Smithson, to whose opinion the ALJ made no assignment of weight, or lack thereof. Namely, the GAF scores assigned to Plaintiff by these two sources, with the exception of Blythe's January 2012 score of forty, ranged from forty-five to fifty. A score of fifty or below is "consistent with a finding of disability." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 527 (6th Cir. 2014);

_____

[7]The ALJ did not mention Dr. Currey by name, but identified his opinion by exhibit number.

*see also footnote 3 supra.* In *Miller*, the Sixth Circuit noted that "we have looked to consistency among low GAF scores to determine that an ALJ minimized the severity of a claimant's symptoms[.]" *Miller*, 811 F.3d at 836.

Nor did the ALJ address any of the *Cruse* factors in connection with Blythe's assessment. The Court is particularly troubled by the fact that the ALJ, in discounting the opinion because it was inconsistent with treatment records, never appeared to consider Blythe's conclusion that Cashion was often unrealistic in her views of her abilities and progress, which cast her statements contained in the records that she was "doing fine" in a different light.

In addition, as noted above, the ALJ did not assign weight to Smithson's assessment. Under the Regulations, "[u]nless a treating source's opinion is given controlling weight," which did not happen here as there was no treating source with respect to Plaintiff's mental impairments,

> the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the Social Security Administration].

20 C.F.R. § 416.927(e)(2)(ii).

As a consequence of the foregoing deficiencies in the ALJ's decision, the Court is unable to follow her reasoning as to the treatment of the evidence before her. Because it precludes meaningful judicial review, the Court cannot determine whether the ALJ's decision was supported by substantial evidence.

Plaintiff also avers that the ALJ failed to properly assess her credibility. The only explicit reference by the ALJ concerning credibility consisted of the following one-sentence paragraph:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(D.E. 9-3 at PageID 61.) As Cashion points out, this is boilerplate language from a template used by the Seventh Circuit. *Sorrell,* 2016 WL 4245467, at *10 (citing *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012)). Use of the template is not in itself error; however, as this Circuit noted, the "chief concern with the popularity of this template . . . is the risk that an ALJ will mistakenly believe it sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Id.* (citing *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 260 (6th Cir. 2015)).

The ALJ's statement appears in her opinion at a point after a summary of the claimant's treatment history. In determining whether the credibility decision was adequate, the Court finds guidance in *Cox*, as the same one-sentence paragraph appeared in both decisions. *See Cox,* 615 F. App'x at 259-60. In that case, the paragraph was sandwiched between the ALJ's discussions of the claimant's daily activities and the medical evidence. *Id.* at 260. The court rejected the Commissioner's argument that an implicit explanation could be inferred from the ALJ's discussion of the record. Specifically, the court noted that her failure to identify what parts of the claimant's assertions or testimony were not credible -- and why -- rendered it unable to "reasonably discern the agency's path" and, thus, could lead to "impermissible speculation as to the grounds for the ALJ's conclusions." *Id.* at 260-61 (internal quotation marks omitted). The same problem is present here. Thus, the ALJ's failure to articulate any reason for her credibility

determination with respect to Cashion constituted reversible error.[8] *See id.* at 260.  Accordingly, this matter is further remanded for additional consideration of Plaintiff's credibility.

*CONCLUSION*

For the reasons articulated herein, the Commissioner's decision is REVERSED and REMANDED to the ALJ for further proceedings consistent with this opinion.  Upon remand, the ALJ shall reassess Plaintiff's residual functional capacity, giving appropriate weight to the opinions of Blythe and Smithson; (2) properly evaluate the claimant's credibility; and (3) pose an appropriate hypothetical or hypotheticals to a VE.

IT IS SO ORDERED this 18th day of October 2016.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[8]Tellingly perhaps, the Commissioner here did not offer any response to Plaintiff's argument as to the credibility determination.